**NOT INTENDED FOR PUBLICATION**

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | **FILED**<br><br>JAMES J. WALDRON, CLERK<br><br>**August 31, 2015**<br><br>U.S. BANKRUPTCY COURT<br>NEWARK, N.J.<br><br>BY: s/ Juan Filgueiras<br>DEPUTY |

In re:

JDN PROPERTIES AT FLORHAM PARK, LLC,

                          Debtor.

---

STACEY L. MEISEL, Chapter 7 Trustee,

                         Plaintiff,

v.

JOSEPH D. NATALE, JDN PROPERTIES, LLC, JDN
PROPERTIES II, LLC, JDN PROPERTIES III, LLC, JDN
PROPERTIES IV, LLC, JDN PROPERTIES@SPRING
LAKE, LLC, JDN PROPERTIES@LEBANON, LLC, JDN
PROPERTIES@24 MOUNTAIN, LLC, TOSCA
RESTAURANT, LLC, CAFÉ EMILIA, INC., and JDN
PROPERTIES@WESTFIELD, LLC, FERNANDO ROQUE,
JENNIFER GRAMBOR, CHRIS TSAMUTALIS, DONNA
CONROY, JOHN DOES 1-10 and ABC CORPORATIONS
1-10,

                         Defendants.

Case No. 10-11697 (VFP)

Chapter 7

Adv. Pro. No. 11-1863 (VFP)

## OPINION

Becker Meisel LLC
Michael E. Holzapfel, Esq.
Eisenhower Plaza II
354 Eisenhower Parkway, Ste. 1500
Livingston, NJ 07039
Attorneys for Chapter 7 Trustee
 Stacey L. Meisel

Podvey, Meanor, Catenacci, Hildner,
Cocoziello & Chattman, PC
Robert L. Podvey, Esq.
One Riverfront Plaza, Ste. 800
Newark, NJ  07102
Attorneys for Defendant, Chris Tsamutalis

Meyner and Landis LLP
Rosaria A. Suriano, Esq.
One Gateway Center, Ste. 2500
Newark, NJ  07102
Attorneys for Defendant, Joseph D. Natale

Graham Curtin P.A.
Patrick J. Galligan, Esq.
Caitlin M. Hillenbrand, Esq.
4 Headquarters Plaza, P.O. Box 1991
Morristown, NJ  07962
Attorneys for Defendant, Donna Conroy, Esq.

**VINCENT F. PAPALIA, United States Bankruptcy Judge**

## I. <u>INTRODUCTION</u>

This matter comes before the Court on the motion of Chapter 7 Trustee and Plaintiff, Stacey L. Meisel (the "Trustee") for the estate of JDN Properties at Florham Park, LLC (the "Debtor"), to enforce the settlement (the "Settlement") of an adversary proceeding which she filed against Debtor's principal, Joseph D. Natale, various entities owned or controlled by Mr. Natale (as named in the Amended Complaint, the "Natale Entities"), and four professionals previously associated with the Debtor, to recover fraudulent transfers and preferences under 11 U.S.C. §§ 544, 547, 548, 549 and 550. The Settlement was never reduced to a final, agreed-upon writing, although numerous drafts were exchanged among the parties. Natale objects to the enforcement of the Settlement. Co-defendant Donna Conroy Esq. ("Conroy") supports the enforcement of the Settlement. The primary basis of the dispute is the parties' disagreement over the scope of the releases included as part of the Settlement and whether an enforceable Settlement Agreement exists between and among the parties.

## II. <u>JURISDICTIONAL STATEMENT</u>

The court has jurisdiction over these matters under 28 U.S.C. § 1334(b) and the Standing Orders of Reference entered by the United States District Court on July 10, 1984 and amended on October 17, 2013. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O). Venue is proper in this court under 28 U.S.C. § 1408. The court issues the following findings of fact and conclusions of law pursuant to FED. R. BANKR. P. 7052.[1]

---

[1] To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

### III. **FACTUAL AND PROCEDURAL BACKGROUND**

Defendant Joseph D. Natale ("Natale") is a New Jersey resident with interests in construction and non-construction entities (Dkt. 70, Amended Complaint, ¶¶ 7, 20; Dkt. 73, Answer, ¶¶ 7, 20).[2] Prepetition in 2007, certain dissatisfied construction clients (the "Akhtars") filed a New Jersey Consumer Fraud Action, N.J.S.A. § 56:8-2, against the Debtor, Natale and others in Superior Court of New Jersey, Law Division, Morris County.  In 2008, the Superior Court entered summary judgment on liability in favor of the Akhtars and against the Debtor and Natale.  Damages were liquidated in a postpetition proof hearing as described below.

The Debtor filed a Chapter 11 petition on January 21, 2010, and the case was converted to Chapter 7 on February 24, 2010.  As ultimately alleged by the Trustee, on or about February 8, 2010 (postpetition but preconversion), Debtor amended its 2005 through 2008 tax returns to recharacterize loans to Natale as equity distributions.  The Chapter 7 Trustee (the "Trustee") filed the instant Complaint on May 27, 2011 under 11 U.S.C. §§ 544, 547, 548, 549 and 550: (1) to recover the $1,600,000 recharacterization as a fraudulent transfer and postpetition preference; and (2) to recover $160,000 in other prepetition transfers (Dkt. 1).

On January 19, 2011, having obtained stay relief in the Bankruptcy Court, and following a proof hearing in Superior Court, the Akhtars obtained judgment against the Debtor, Natale and others for $7,373,374 (including exemplary damages) under the New Jersey Consumer Fraud Act (Dkt. 127-1, Ex. A, Amended Order and Judgment) (the "Judgment").  Natale appealed the Judgment and unsuccessfully sought to stay this adversary proceeding while the appeal was pending (Dkt. 64, Order denying stay of adversary proceeding, February 13, 2013).

The Trustee filed an Amended Complaint and moved on September 10, 2012 for summary judgment (Dkt. 22, summary judgment motion).  In an oral opinion on February 8, 2013, the Bankruptcy

---

[2] Docket entries refer to adversary proceeding 11-1863-VFP, unless otherwise stated.

Court denied Trustee's motion for summary judgment largely because the Trustee was unable to establish that the findings and conclusions of the Superior Court (generated by the summary judgment and proof hearing on damages) collaterally estopped Natale from denying liability on the Trustee's claims (Dkt. 83, Transcript of February 8, 2013 opinion of the Bankruptcy Court; Dkt. 22, Ex. U, Transcript of January 14, 2011 opinion of the Superior Court).

On March 19, 2013 the Trustee, with leave of the Bankruptcy Court, filed a Second Amended Complaint (Dkt. 70) which added claims against Natale, but in relevant part added four professionals of Debtor/Natale and alleged that they aided and abetted Natale's alleged breach of fiduciary duty:

| | | |
|---|---|---|
| Donna Conroy, Esq. ("Conroy") | - | former counsel to Debtor and Natale |
| Chris Tsamutalis | - | accountant to Debtor and Natale |
| Fernando Roque | - | former in-house accountant to Debtor[3] |
| Jennifer Grambor | - | former in-house bookkeeper to Debtor |

On September 25, 2014, Conroy moved to dismiss the Second Amended Complaint (largely for Trustee's failure to include an Affidavit of Merit as to Conroy), a motion never joined and now returnable on September 15, 2015 (Dkt. 121). Judge Kaplan of this Bankruptcy Court, then assigned to this adversary proceeding, held settlement conferences on July 17, 2014 and on October 1, 2014 (Dkt. 127-1. ¶ 16). On February 24, 2015, the New Jersey Appellate Division *vacated* both the January 19, 2011 damage award against Natale, the Debtor and others and the 2008 summary judgment on liability which had issued in favor of the Akhtars and remanded the case to the trial court for a jury trial.

On April 30, 2015 the Trustee filed the instant motion to enforce the Settlement and a related Notice of Settlement of Controversy (Dkt. 127 and 128). Objections and responses by Natale and Conroy followed. The primary basis of the dispute is the scope of releases embodied in the Settlement and whether an enforceable settlement agreement exists between and among the parties. The Bankruptcy

---

[3] The parties agree that Grambor and Roque will benefit from the Settlement although they have taken no active part.

Court held a hearing on June 2, 2015 and requested additional submissions from the parties, which were made through June 25, 2015.

In connection with those supplemental submissions, the parties agreed that the Court could decide this matter on the basis of the record before it, without the need for an evidentiary hearing. *See, e.g.,* Docket Nos. 148, 149 and 150. This Court agrees. No hearing is necessary where there is no dispute as to the facts underlying a motion to enforce a settlement. *See Tiernan v. Devoe*, 923 F.2d 1024, 1031 (3d Cir. 1991), *citing Petty v. Timken Corp.*, 849 F.2d 130, 132 (4th Cir. 1988) (finding summary enforcement of settlement agreement appropriate); *Amatuzzo v. Kozmiuk*, 305 N.J. Super. 469, 474-75 (App. Div. 1997) ("[o]n a disputed motion to enforce a settlement, as on a motion for summary judgment," a hearing is not necessary if the available competent evidence allows the factfinder to resolve factual disputes in favor of the non-moving party); and *Filtrator Apparatus Co., Inc. v. Food Enter., Inc.*, 491 F. Supp. 566, 568-69 (D.N.J. 1980) (there was no need to look beyond the submitted affidavits or to conduct an evidentiary hearing to decide that a newly filed complaint was barred by a prior release and stipulation of dismissal).

## IV.  **ARGUMENTS OF THE PARTIES**

### A.  **The Chapter 7 Trustee**

In her motion, the Trustee identified the Settling Parties as: (i) the Trustee; (ii) Natale; (iii) the defendant Natale Entities; (iv) Conroy; (v) Tsamutalis; (vi) Grambor; (vii) Roque; and (viii) the Lloyds of London underwriters on Conroy's professional liability policy SYN-102786 (Dkt. 127-2, p.2). No party indicated otherwise.

The Trustee, through counsel, Michael E. Holzapfel, Esq., described the terms of the Settlement as follows:

1. Natale, Conroy and Tsamutalis will pay $140,000 to the estate which would immediately disburse it to Trustee's counsel for fees;

2.  The Trustee will dismiss the adversary proceeding with prejudice, "*and all claims asserted by the Settling Parties related to the Adversary Proceeding and the Bankruptcy Case would be released*";

3.  The Settlement is conditioned on the Bankruptcy Court's dismissal of the bankruptcy case;

4.  The *pro rata* contribution toward the Settlement payment will be confidential "unless disclosure of this information is compelled by this Court or other legal process";

5.  The Settling Parties agreed not to disclose the terms of the Settlement, except to the extent compelled by law or to satisfy the Fed. R. Bankr. P. 9019 motion; and

6.  The Settling Parties agreed not to disparage one another.

(Dkt. 127-1, Trustee's Application in Support of Motion, ¶ 20) (emphasis supplied).  The Trustee reported in her initial submission that Natale balked at consummating a Settlement Agreement because he did not want the releases (paragraph 2 above) to prevent his bringing certain potential claims against Conroy who maintained that such claims would be barred by the Settlement (Dkt. 127-1, ¶¶ 28-30).[4]

The Trustee indicated that she had no interest in any claim between Natale and Conroy, that any party was free to bring a claim unless it was barred by the entire controversy doctrine or "relates to the Adversary Proceeding"; and that the Settlement should not be delayed while the co-defendants negotiated this side issue (Dkt. 127-1, ¶¶ 30-31).  The Trustee argued that the material and essential terms of the Settlement, stated at Dkt. 127-1, ¶ 20 and summarized above, were fixed at the conclusion of the October 1, 2014 mediation session, that subsequent disagreements between Conroy and Natale as to the scope of the releases were only raised after the Settlement had been reached on October 1, 2014, and that the Settlement should therefore be enforced under applicable New Jersey law (Dkt. 127-1, ¶¶ 35-39).

---

[4] Additionally, Natale sought to require the Trustee to bring an application in State Court to confirm that Natale could fund his portion of the Settlement.  The Trustee refused to do so, but this "objection" was subsequently mooted.

### B.  Joseph Natale

Natale stated and argued in his initial certification in opposition to the Trustee's motion that a

release was not specifically discussed during Settlement (though Natale's counsel understood a limited

release would be provided), that Natale never intended to release all claims which he might have against

Conroy, and that, because Conroy had rejected a limited release, the Settlement was defective as to a

material term and could not be enforced:

> 6.    Although, I understood that a limited release would be exchanged among
> the parties, at no time during those discussions was a release discussed, especially
> a broad release.
>
> 7.    [I]t was never my intention or agreement to provide a broad release to any
> of the parties.
>
> 8.    I never intended to release any claim against [Conroy], except for the
> limited claim asserted by the Trustee in this action that the filing of the amended
> tax returns by the Debtor during the course of the bankruptcy violated both the
> bankruptcy code and raised issues regarding certain deductions and exemption
> taken by the Debtor.
>
> 9.    That was the only claim I agreed to release.
>
> 10.    Since [Conroy] has rejected a limited release, there was never a meeting
> of the minds as to the release, a material term of the settlement, and thus, the
> Trustee Settlement Agreement should be set aside.

(Dkt. 131-1, Natale Cert., ¶¶ 6-10).

Accordingly, Natale argued that the Settlement should be rejected because Natale and Conroy

did not agree upon the extent of the release, which counsel for Natale argues is a material term (Dkt.

131-2, Suriano Cert., ¶ 6).  Natale characterized the release language which Conroy sought in the

Settlement as "broad" and "requir[ing] that Natale and the JDN Entities release all claims against

Conroy, including claims not included in the adversary proceeding" (Dkt. 131-2, ¶ 5).  Counsel indicated

that Natale was considering impleading Conroy in the Akhtar matter and would not accept a release so broad that it prevented him from doing so (Dkt. 133, ¶ 34; Dkt. 131-2, ¶ 45).[5]

### C. Donna Conroy

Like the submissions of the other parties, the Court's review of Conroy's initial submission (through her counsel Patrick J. Galligan, Esq.) was limited by citation to allegedly competing forms of releases in the draft Settlement Agreements that were not initially provided to the Court (*See e.g.*, Dkt. 132, letter brief, p.2, ¶ 3, and p.3). These deficiencies were rectified in later submissions. Conroy argues that: (1) the release language proffered by the Trustee protected Conroy in the Akhtar litigation; and (2) even if Natale carved out the Akhtar litigation from the release, Natale's alleged claims against Conroy in the Akhtar litigation would be barred by time or New Jersey law procedure (Dkt. 132, pp. 8-9). In conclusion, Conroy asked the Court to enforce the Settlement proposed by the Trustee (Dkt. 132, pp. 9-10).

### D. Reply certifications and further submissions

Trustee's counsel certified in reply that during the 2014 settlement conferences, "neither Natale nor his counsel mentioned anything about a carve-out of future claims against Conroy as a material condition to Settlement" (Dkt. 137, Holzapfel Cert., ¶ 12). In another supplemental pleading, Natale again argued that the release was a material term on which there was no meeting of the minds so that the Court could not approve the Settlement (Dkt. 150, letter brief filed June 23, 105, ¶ 2). In his final submission (a June 23, 2015 letter brief docketed twice at Dkt. 150 and 153), Natale argued that the release was a material term on which there was no meeting of the minds so that the Court cannot approve the settlement (Dkt. 150, June 23, 2015 letter brief of Ms. Suriano, ¶ 2). In her penultimate submission, however, Ms. Suriano proposed in the alternative: (1) that the Court deem the release a material term on which there was no meeting of the minds and therefore no settlement; or (2) that the Court enforce the

---

[5] Dkts. 131-2 and 133 represent a single document to which counsel submitted two corrective pages at Dkt. 133.

settlement with the limited release proposed by Natale (Dkt. 148-1, June 16, 2015 letter brief, pp. 6, 8;

Dkt. 148-2, Rosario Cert., dated June 16, 2015, ¶ 21).

Mr. Galligan, on behalf of Donna Conroy, having previously argued that the Court could approve

the limited release embodied in the December 4, 2014 circulated draft Settlement Agreement (Dkt. 138,

Galligan Cert., ¶¶ 27-29, Dkt. 146, Ex. G, ¶ 1, December 4, 2014 Settlement Agreement from Galligan),

ultimately argued that the matter was settled on October 1, 2014 and that the Court should enforce the

settlement as embodied in the Trustee's moving papers at Dkt. 127, ¶ 20 (Dkt. 152, June 23, 2015 letter

brief of Mr. Galligan, pp. 2-3).

### E.  Development of the Settlement Agreement and release language

Initially, although some of the correspondence relating to the Settlement and draft Settlement

Agreement was provided, no party provided any version of its draft Settlement Agreement to the Court.

Upon the Court's request to inspect the parties' communications and draft settlement agreements in order

to track the development of the release language, on June 5, 2015 Conroy's attorney submitted a

chronological run of e-mails dated October 3, 2014 through April 13, 2015 with certain draft settlement

agreements attached (partly redacted) (Dkt. 146, Ex. A-LL; Dkt. 147, June 2, 2015 Transcript, T20:13-

16; T26:15-22).

In these documents, Natale and, in fact, all the parties to this case acknowledged that a Settlement

was reached during the mediation before Judge Kaplan on October 1, 2014. *See, e.g.,* Dkt. 146, Ex. A,

October 3, 2014 e-mail from Ms. Suriano to Mr. Galligan, Mr. Holzapfel, and others ("Pat [Galligan],

*as a result of the settlement reached on Wednesday*, please withdraw the motion to dismiss [the adversary

proceeding] filed on behalf of Donna Conroy") (emphasis supplied).  Additionally, the early drafts of

the Settlement Agreement contain language confirming the claims asserted by the involved parties in the

Adversary Proceeding and Bankruptcy Case "were settled on October 1, 2014." *See, e.g.*, Dkt. 146, Exs.

B, D and E, draft of Settlement Agreement at ¶ 1.

9

The first draft of the Settlement Agreement which was entitled "Global Release and Confidentiality Agreement" (the "Settlement Agreement"), was generated by Conroy's counsel and circulated on October 23, 2014.  (*See* e-mail colloquy among counsel for Natale, Conroy and Trustee on October 13, 2014 at Dkt. 138, Ex. B).  Each draft of the Settlement Agreement was titled in the same manner.  Each draft also has a first paragraph entitled "Release."  Also, each draft defined the "Litigations," i.e., the claims being released, as the Adversary Proceeding and Bankruptcy Case.

Specifically, the first circulated draft of the Settlement Agreement contained the following release language (cited in relevant part) in its first paragraph and defined "the Litigations" for which claims were to be released:

1. **Release.**

> In consideration of the monies described in Paragraph 2, Releasors hereby irrevocably and unconditionally release, acquit and forever discharge the Releasees from any and all past, present or future claims . . . which arise out of or relate anything that has happened up until this date and which specifically arise out of, relate to or concern the events more particularly described in the Complaint or any other pleadings filed in connection with the action entitled Meisel v. Natale, et als., Adv. pro. No. 11-01863, and the related bankruptcy action entitled In re:  JDN Properties at Florham Park, LLC, Case No. 10-11697, (collectively, "the Litigations"), *which suits were settled on October 1, 2014. . . .*

> Finally, each of the Releasees . . . hereby releases and discharges with prejudice, and without costs, each of the other Releasees from all past or present, known or unknown, claims . . . of any nature, whether based on tort, contract or other theory of recovery.

(Dkt. 146, Ex. B, draft Settlement Agreement, ¶ 1, circulated by Conroy's attorney on October 23, 2014) (emphasis supplied).

After receiving the October 23, 2014 draft of the Settlement Agreement, Natale's counsel generally commented that most of her client's suggested changes "deal with the very broad nature of the release between the defendants."  *See* Dkt. 146, Ex. D (partial), November 11, 2014 e-mail from Ms. Suriano to Caitlin Hillenbrand (Mr. Galligan's associate) and others.  The revised draft of the Settlement Agreement prepared by Natale's counsel on November 14, 2014 included a release as to the "specific

10

claims asserted in the Litigations, and only as they apply to the bankruptcy proceeding (including attorneys' fees and costs actually incurred), except that Releases do not release a breach or breaches of the Release." (Dkt. 146, Ex. D, draft Settlement Agreement at ¶ 1.)  In fact, this same language is included twice in that same paragraph.  The modifications suggested by Natale's counsel went on to include additional language by which it appears that counsel attempted to further define the limited scope of the Release.  There, Natale's counsel wrote that the Release would not apply to (without limitation) "general business matters, tax matters, legal matters, legal and tax advise [sic], and representation." (Dkt. 146, Ex. D, ¶ 1).

Counsel for Conroy responded to the proposed changes by deleting the new language summarized in the preceding sentence regarding the additional limitation on the scope of the Release, but adopting significant portions of the language prepared by counsel for Natale, as cited in the December 4, 2014 draft circulated by Conroy's counsel, including the following:

> Each of the Releasees and all of his/her/its personal representatives, agents, heirs and assigns and successors hereby releases and discharges with prejudice, and without costs, each of the other Releasees *from the specific claims asserted in the Litigations, and only as they apply to the bankruptcy proceeding (including attorneys' fees and costs actually incurred), except that Releasees do not release a breach or breaches of this Release.*

(Dkt. 138, May 29, 2015 Galligan Cert., ¶ 27; and Dkt. 146, Ex. G, ¶ 1, December 4, 2014 draft Settlement Agreement from Galligan) (emphasis supplied).  Consistent with the foregoing, in one of the pleadings by Ms. Conway's counsel it is stated that "Ms. Conway is only seeking a release of the claims related to the Litigations. . . ." (Dkt. 138, Galligan Cert., ¶ 29).

Similarly, the draft of November 24, 2014 also included limiting language (apparently) prepared by the Trustee, stated as follows:  "The releases set forth in the foregoing paragraph apply to claims arising out of or related to the Litigations only and shall not apply to any claims arising out of or unrelated to the Litigations." (Dkt. 146, Ex. E, Settlement Agreement, ¶ 1.)

11

As to Natale's position, *see e.g.,* the November 14, 2014 draft from Ms. Suriano, which sought

to amend the Trustee's proposed Settlement Agreement to provide as follows:

> Each of the Releasees . . . hereby releases and discharges with prejudice, and
> without costs, each of the other Releasees from the specific claims asserted in the
> Litigations, and only as they apply to the bankruptcy proceeding (including
> attorneys' fees and costs actually incurred), except the Releasees do not release a
> breach or breaches of this Release.

(Dkt. 146, Ex. D, November 14, 2014 draft Settlement Agreement.)

Similarly, in a revised draft of March 7, 2015, Natale's counsel included the following proposed

limiting language:

> Notwithstanding the foregoing, the releases provided for in this section shall not
> apply to any claim, cause of action, demand, matter, right or obligation ("Exempted
> Claims") not specifically identified in the Litigations or that are unrelated to the
> bankruptcy case of the Debtor, it being the express intent of this Release to exempt
> the Exempted Claims from the Release.

(Dkt. 146, Ex. Y, draft Settlement Agreement under March 7, 2015 e-mail from Ms. Suriano to Trustee's

attorney).  As to Conroy, *see, e.g.,* the March 17, 2015 proposal from Conroy's attorney provided that:

> 2.   With respect to [R. Suriano's] "Exempted Claims" section, we would propose the
> following revision:
>
> Notwithstanding the foregoing, the releases provided for in this section shall not
> apply to any claim, cause of action, demand, matter, right or obligation ARISING
> OUTSIDE the Litigations ("Exempted Claims"), it being the express intent of this
> Release to exempt the Exempted Claims from the Release.

(Dkt. 146, Ex. BB, March 17, 2015 e-mail from Mr. Galligan to Trustee's attorney and others) (no

Settlement Agreement attached).   On March 17, 2015 Ms. Suriano responded, "I am ok with numbers

1 & 2 [quoted, in part, *supra*] . . . .  I want to keep my language in the exemption to the release."  (Dkt.

146, Ex. DD, March 17, 2015 e-mail from Ms. Suriano to Mr. Galligan).

Thus, despite the protestations of Conroy and the Natale Entities, they both indicated, in writing,

and on more than one occasion, that a Release was included in the Settlement Agreement, that the

Release included the claims asserted in the Adversary Proceeding and Bankruptcy Case, i.e., the

"Litigations," and that the scope of the Release was limited in that it did not apply to claims not raised

in the Adversary Proceeding or Bankruptcy Case.

### F.  Hearing on June 2, 2015

At the hearing on June 2, 2015 Natale and Conroy, through counsel, agreed on the record that

they had reached a Settlement on October 1, 2014 before Judge Kaplan:

> THE COURT:  But when the parties were before Judge Kaplan did the parties advise the
> Court that there was a settlement reached?
>
> MS. SURIANO:  Judge, when we appeared before Judge Kaplan the focus of the entire
> proceeding was on the amount of the settlement and who was paying what.  The balance
> of the terms of the settlement conceptually, yes, we agreed that there was a settlement.
> However we also agreed that we would hammer out the terms after we left Judge Kaplan's
> courtroom.  So conceptually there was a settlement as to the amount and who was paying
> what.  That was agreed to.

(Dkt. 147, Transcript of June 2, 2015 hearing, T7:8-18).  Mr. Galligan declared:

> MR. GALLIGAN: . . .  My intention was and the parties' intention when we reached the
> settlement was that the claims related to the adversary proceeding and the bankruptcy
> proceeding were going to be released.  The trustee agrees with that.

(Dkt. 147, T18:1-4).  Ms. Suriano further acknowledged that "there was going to be some release" (Dkt.

147, T7:24-25).

On the record on June 2, 2015 Mr. Galligan, referring to his May 29, 2015 Certification (Dkt.

138, ¶ 27), stated that he "would live with" the release language which he proposed to Ms. Suriano in

the e-mail of December 4, 2014 and which Mr. Galligan reiterated in his May 26, 2015 Certification at

paragraph 27:

> Each of the Releasees and all of his/her/its personal representatives, agents, heirs and
> assigns and successors hereby releases and discharges with prejudice, and without costs,
> each of the other Releasees for the specific claims asserted in the Litigations, and only as
> they apply to the bankruptcy proceeding (including attorneys' fees and costs actually
> incurred), except that Releasees do not release a breach or breaches of this Release.

(Dkt. 146, T21:19-T22:17; Dkt. 138, Galligan Cert., of May 26, 2015, ¶ 27).  Also evident in the June

2, 2015 hearing, as developed below, were: (1) Natale's subsequent efforts to amend the original release

Case 11-01863-VFP    Doc 159    Filed 08/31/15    Entered 09/01/15 18:08:44    Desc Main
Document      Page 14 of 21

language quoted from October 23, 2014, above, to include Natale's release of claims against Conroy related to income tax returns and exclude claims relating to the Akhtar litigation; and (2) Mr. Galligan's determination to have the original release language quoted above from the October 23, 2014 circulation by his office include and release any claims which Natale might bring against Conroy as a result of the vacation of the Akhtar judgment (*See* Dkt. 147, T11:16-T15:14; T17:12-15 as to colloquy on release of tax claims; and Dkt. 147, T17:20-21:12 as to colloquy on expansion of releases to protect Conroy in the Akhtar case).

At that hearing, Ms. Suriano promoted the entry of a Settlement Agreement, now dated March 2015, which included the release of tax claims (Dkt. 147, T17:9-15; Dkt. 142, Suriano Cert. filed June 1, 2015, Ex. I). As to Conroy, Mr. Galligan stated at the outset of his argument (already quoted above) that, "My intention was and the parties' intention when we reached the settlement was that the claims related to the adversary proceeding and the bankruptcy proceeding were going to be released" (Dkt. 147, T18:1-4). Further, although Mr. Galligan agreed with the Court's statement that, "The litigations means this adversary proceeding through the second amended complaint and the bankruptcy case" (Dkt. 147, T18:13-16),[6] he later argued that the adversary proceeding "includes Akhtar":

> I am intending that the release apply to anything for the bankruptcy and adversary proceeding which includes Akhtar.

(Dkt. 147, T45:21-23). Mr. Galligan opined that Natale was contemplating issues with Conroy in another case not previously disclosed (*First State Bank v. Gasparro v. Natale & Conroy*) and reiterated Conroy's adherence to the releases issued in October 23, 2014:

> However, [Natale] cannot bring claims related to the adversary proceeding or the bankruptcy proceeding. I don't need to raise that in October because we knew that's what was being released, the trustee's attorney says it, there's no dispute over that.

---

[6] As noted above, Mr. Galligan's office circulated the first Settlement Agreement on October 23, 2014 and defined the "Litigations" as "the action entitled Meisel v. Natale, et als., Adv. Pro. No. 11-01863, and the related bankruptcy action entitled In re: JDN Properties at Florham Park, LLC, Case No. 10-11697" (Dkt. 146, Ex. B, Settlement Agreement, ¶ 1, circulated by Conroy's attorney on October 23, 2014).

(Dkt. 147, T46:5-9).  Mr. Galligan concludes that Conroy's release language forwarded to Ms. Suriano

on or about December 4, 2014 and already quoted above (Dkt. 138, Galligan Cert., ¶ 27) "accurately

reflects" the Trustee's summary, in her Motion to Approve the Settlement, of the language of the release,

that is:

> In consideration of the Settlement Payment, the Trustee would dismiss the
> Adversary Proceeding with prejudice, and all claims asserted by the Settling
> Parties related to the Adversary Proceeding and the Bankruptcy Case would be
> released.

(Dkt. 147, T21:6-T23-14; Dkt. 127, Trustee's Cert., April 30, 2015, ¶ 20(b)).   Mr. Galligan also

acknowledged that the issue of releasing Conroy as to any Akhtar-related claims was new in March

2015:

> This is not a surprise to anyone, Your Honor.  The fact that the <u>Akhtar</u> litigation
> comes up for the first time in March 18th, the settlement agreements are supposed
> to be confidential . . . .  That's the only reason we removed it or did not submit it.
> But <u>Akhtar</u> never appeared until March 18th, 2015.

(Dkt. 147, T20:5-12).  *See also* the e-mail exchange between Mr. Galligan and Ms. Suriano on March

18, 2015 (Dkt. 146, Ex. GG).  However, as noted above, specific release language relating to the tax

returns and the Akhtar litigation surfaced only after numerous earlier drafts of the Settlement Agreement

were circulated.

In sum, based on the foregoing record, this Court concludes, as a factual matter, that: (1) on

October 1, 2014, the parties reached an enforceable settlement which included the exchange of releases

among the parties; (2) the claims released were those asserted in the Bankruptcy Case and Adversary

Proceeding, i.e., the "Litigations"; (3) the co-defendants' efforts to specifically identify the tax claims

and Akhtar litigation as claims that were (or were not) being released were late developments not

contemplated or specifically discussed at the time the Settlement was reached at the October 1, 2014

settlement conference before Judge Kaplan.

## V.  LEGAL ANALYSIS AND CONCLUSIONS OF LAW

Bankruptcy favors compromise.  *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996) *citing* 9 COLLIER

ON BANKRUPTCY 9019.03[1] (15th ed. 1993).  "Settlement agreements are contracts between the parties

and contract principles are generally applicable to their construction."  *Marine Midland Realty Credit

Corp. v LLMD of Michigan, Inc.*, 821 F. Supp. 370, 373 (E.D. Pa. 1993).   The instant Settlement

Agreement required that its interpretation and construction be governed by New Jersey law (Dkt. 146,

Ex. B, Settlement Agreement, ¶ 11).  Under New Jersey contract law:

> A contract arises from offer and acceptance, and must be sufficiently definite 'that
> the performance to be rendered by each party can be ascertained with reasonable
> certainty.' Thus, if parties agree on essential terms and manifest an intention to be
> bound by those terms, they have created an enforceable contract. Where the
> parties do not agree to one or more essential terms, however, courts generally hold
> that the agreement is unenforceable.

*Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 438 (1992) (internal citations omitted).  "An agreement to

settle a law suit, voluntarily entered into, is binding upon the parties, whether or not made in the presence

of the court, and even in the absence of a writing."  *Green v. John H. Lewis & Co.*, 436 F.2d 389, 390

(3d Cir. 1971); *accord Pascarella v. Bruck*, 190 N.J. Super. 118, 124 (App. Div. 1983), *cert. den.*, 94

N.J. 600 (1983) (plaintiff's oral agreement to settle a medical malpractice action on the eve of trial for a

sum certain was enforceable, where the court found offer, acceptance and adequate consideration, such

that plaintiff was not permitted to withdraw from the settlement because she had a change of heart).

Whether the parties reach a meeting of the minds during settlement is measured by their objective

behavior, and a party cannot repudiate a settlement because it harbored a private agenda.  *Hagrish v.

Olson*, 254 N.J. Super. 133, 138 (App. Div. 1992).  In *Hagrish,* the plaintiff-purchasers obtained a

$32,000 judgment for return of deposit against defendant-sellers and their law firm, saw their judgment

set aside under N.J.R. 4:40-2(b), and settled the matter for $7,000 in consideration of plaintiffs'

abandoning their appeal.  *Hagrish*, 254 N.J. Super. at 135-36.  The Appellate Division found the

settlement manifest in an exchange of attorney letters which included defendants' demand for "general

16

releases" from plaintiffs. *Id.* at 136. Thereafter, the demand for mutual releases escalated until after the plaintiffs' time to appeal had expired. *Id.* at 137.

The Appellate Division determined that one attorney-defendant never intended to provide a release because he harbored a "hidden agenda" to sue the plaintiffs. *Id.* at 138. The Appellate Division concluded that a settlement had been reached and reversed and remanded with specific instructions to the trial court to enter an Order enforcing the settlement and dismissing all claims associated with the litigation:

> The parties had reached a settlement agreement with certain and specific terms: defendants would pay plaintiffs $7,000 and plaintiffs would not pursue their appeal of the judgment notwithstanding the verdict. The case would be over when the parties fulfilled these simple conditions. Absent unusual circumstances, the courts should enforce executory agreements to settle litigation. . . .
>
> There was a meeting of the minds despite [attorney-defendant's] undisclosed intention to preserve a right to maintain a lawsuit against the plaintiffs. The parties' objective intent governs. A contracting party is bound by the apparent intention he or she outwardly manifests to the other party. It is immaterial that he or she has a different, secret intention from that outwardly manifested.

*Hagresh*, 254 N.J. Super. at 137-38. That the court in *Hagresh* deemed the releases nonessential does not blunt its applicability to the instant case. *Id.* at 138. A settling party cannot balk at consummating a settlement because it harbored a secret agenda from that manifest during negotiations.

Similarly, in *Bistricer v. Bistricer*, 231 N.J. Super. 143, 146-47 (Ch. Div. 1987), a family dispute over a valuable apartment complex, family members reached a settlement over two days in the presence of the court and then declined to enter a stipulation of settlement. The Court determined that the six-disputed points were new terms or related to implementing the agreement (but were in any event nonessential). *Id.* at 149. The court reiterated:

> [I]t is not necessary for a writing to contain every possible contractual provision to cover every contingency in order to qualify as a completed binding agreement. Some of these issues may be determined by the operation of law, or the parties may resolve such differences by a subsequent agreement or a contract may be silent in those respects. In any event a contract is no less a contract because some preferable clauses may be omitted either deliberately or by neglect. So long as the

17

> basic essentials are sufficiently definite, any gaps left by the parties should not frustrate their intention to be bound. Such is the just and fair result. . .
>
> The key factor is not the absence of any contractual undertakings which may normally be undertaken by contracting parties engaged in a similar transaction. It is rather the intent of the particular parties involved in the transaction at issue. And the presence or absence of essential contract provisions is but an element in the evidential panorama underlying a factual finding of intent and enforceability.

*Bistricer*, 231 N.J. Super. at 148, *citing Berg Agency v. Sleepworld*, 136 N.J. Super. 369, 376-77 (App. Div. 1975). *And see U.S. v. Lightman*, 988 F. Supp. 448, 458-60 (D.N.J. 1997) (summarizing the above principles and finding offer, acceptance and parties' intent to be bound by an agreement to fund an environmental cleanup project).

In the instant case, the Court finds the Settlement reached on October 1, 2014 to be a binding agreement, substantially as set forth in the six terms described at Dkt. 127-1, Trustee's Application in Support of Motion, ¶ 20. The terms of the Settlement described in that paragraph will be adopted, except that the release will provide that:

> (b)      In consideration of the Settlement Payment, the Trustee will dismiss the Adversary Proceeding, with prejudice. Any and all claims asserted by the Settling Parties in the Adversary Proceeding and Bankruptcy Case are released. Any claims that were not asserted by the Settling Parties in the Adversary Proceeding or Bankruptcy Case are not released.

The parties' agreement to these terms is manifest, for example, as previously set forth above, in the e-mail exchanges and colloquies in October 2014 (Dkt. 146, Ex A, October 3, 2014) (where the parties acknowledged that a Settlement was reached on October 1, 2014, that the Settlement included releases of claims that related to the Adversary Proceeding and Bankruptcy Case; i.e., the "Litigations"); (Dkt. 138, Ex. B). Indeed, the parties' agreement to each of the Trustee's terms, except the present scope of the releases, was reiterated on the record on June 2, 2015 (Dkt. 147, T7:8-18, T18:1-4).

The Court also finds that the release was an essential term of the Settlement Agreement that was included in every draft in its title and at ¶ 1. Ms. Suriano acknowledged that "there was going to be some release" (Dkt. 147, T7:24-25) and commented upon (rather than deleting) the release language

18

included in every draft.  Mr. Galligan acknowledged that he "would live with" release language which he proposed in December 4, 2014 (Dkt. 147, T21:19-T22:17; Dkt. 138, Galligan Cert., of May 26, 2015, ¶ 27).  The later efforts of Natale and Conroy to include tax disputes and the Akhtar matter within or without the scope of the Release were afterthoughts not contemplated on October 1, 2014 when the parties settled the adversary proceeding and provided for the dismissal of the bankruptcy case.

In short, the material terms of the Settlement were agreed to on October 1, 2014 and will be enforced by this Court, with a release that is limited to claims asserted in the Litigations.  The precise contours of the release and specific claims to which the release applies are not being decided by this Court at this time, nor is it required to do so.  As in *Bistricer*, the Settlement is enforceable notwithstanding the fact that the parties may not have covered every contingency or expressly and specifically described each and every claim to which the releases would or would not apply.  Instead, they did so by referring repeatedly to the claims asserted in the Adversary Proceeding and Bankruptcy Case and their agreement will be enforced accordingly.

## VI.    APPROVAL OF THE SETTLEMENT AND SETTLEMENT AGREEMENT

Federal Rule of Bankruptcy Procedure 9019 provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement" of a bankruptcy case.  FED. R. BANKR. P. 9019(a).  The decision to approve the settlement "lies within the sound discretion of the Bankruptcy Court."  *In re Martin*, 91 F.3d 389, 396 (3d Cir. 1996).  A Bankruptcy Court must determine whether a settlement is "fair and equitable" and in the "best interests of the estate."  *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 136 (Bankr. D.N.J. 2010).  The Court must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal."  *In re Martin*, 91 F.3d at 393.  The Third Circuit "recognize[s] four criteria that a bankruptcy court should consider in striking this balance":

> (1) the probability of success in the litigation;
> (2) the likely difficulties in collection;

(3) the complexity of the litigation involved, and the expense, inconvenience
and delay necessarily attending it; and
(4) the paramount interest of the creditors.

*In re Martin*, 91 F.3d at 393 (quoted, paragraphing added).  The Court should not conduct a "mini-trial" on the merits but "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness."  *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (internal quotations omitted).

As to probability of success in the litigation, the Trustee opines that Natale's defenses to the Trustee's § 549 claims are "objectively reasonable," particularly as an IRS audit found no irregularities in the amended 2014 returns and as co-defendants Grambor and Roque testified that they did not understand the transfers to constitute loans (Dkt. 127-1, ¶¶ 53, 55-56).  As to difficulties in collecting a judgment, the Trustee observes that the Akhtars unsuccessfully pursued Natale for years and were unable to collect on the Judgment when it was extant; that Natale may not keep many assets in his own name; and that co-defendants have limited assets; and that insurance claims were not timely asserted against co-defendant professionals (Dkt. 127-1, ¶ 57-60).  As to complexity and expense of continued litigation, the Trustee observes that the bankruptcy estate has been insolvent for years, that discovery would take a year to unfold, and that the Trustee would likely have to fund continued litigation to a "substantial hardship," so that a cost-benefit analysis favors settlement over continued litigation (Dkt. 127-1, ¶ 63).  As to the "paramount interest" of creditors, the Trustee characterizes the bankruptcy case at this juncture as a two-party dispute between the Akhtars and the Debtor/Natale, and that the Akhtars better prospect for recovery is to continue to litigate in state court, as the only asset of the estate is this very adversary proceeding (Dkt. 127-1, ¶ 65).

No party has argued that the *Martin* standards have not been satisfied in this case, and with good reason.  This litigation has dragged on for years and is the only remaining asset of this estate.  As noted by the Trustee, Natale and his entities have asserted reasonable defenses to the Trustee's claims, which

calls into question the likelihood of success of the Trustee's claims.  Further, even if successful, the difficulty in collecting a judgment in this case is well documented as the Akhtar's recovered nothing despite holding an unstayed judgment for years.  The complexity and expense of continuing litigation also weighs strongly in favor of approving the Settlement, as discovery would take a year or more to conclude and the Trustee would have to fund the continuing litigation in a case at little or no other assets. Thus, the cost-benefit analysis favors approval.  Finally, as the Trustee notes, this case is now essentially a two-party dispute involving the Natale entities and the Akhtars.  With the reversal of the judgment in favor of the Akhtars, this matter should return to State Court for final resolution.  Thus, the Settlement will be approved and the case dismissed, as there is no reason or benefit to creditors to continue the proceedings before this Court.

## VII.   <u>CONCLUSION</u>

For the reasons set forth above, and without specifically adopting the language of any party, the Court finds that the parties reached the Settlement on October 1, 2014 and that the releases apply to any and all claims asserted in the Adversary Proceeding or in the Bankruptcy Case.  Claims that were not asserted in the Adversary Proceeding or Bankruptcy Case are not released.  The Settlement and Settlement Agreement are approved and the Court will enter an implementing Order.

Dated: August 31, 2015                     /s/ Vincent F. Papalia
                                           VINCENT F. PAPALIA
                                           United States Bankruptcy Judge